214 P.3d 1217 (2009)
David TUDOR, Individually and as Special Administrator of the Estate of Tracy Tudor, Deceased, Appellant,
v.
WHEATLAND NURSING L.L.C., d/b/a Wheatland Nursing & Rehabilitation Center, Appellee.
No. 101,026.
Court of Appeals of Kansas.
September 4, 2009.
*1219 Karen Eager, of Disability Rights Center of Kansas, for appellant.
Bradley S. Russell and Tracy M. Hayes, of Sanders, Conkright & Warren. L.L.P., of Overland Park, for appellee.
Before McANANY, P.J., ELLIOTT and CAPLINGER, JJ.
CAPLINGER, J.
David Tudor, individually and as administrator of the estate of his deceased brother, *1220 Tracy Tudor, brought a survival and wrongful death action against Wheatland Nursing L.L.C., d/b/a Wheatland Nursing and Rehabilitation Center (Wheatland) alleging Wheatland was negligent in failing to monitor Tracy and supervise its employees, thereby resulting in Tracy's death. The district court granted summary judgment in favor of Wheatland based on David's failure to identify an expert witness to establish the applicable standard of care.
We conclude the district court properly found that expert testimony was required regarding the applicable standard of care, and we affirm the grant of summary judgment in favor of Wheatland.

Factual and procedural background
In the early 1970's, Tracy was diagnosed with severe cerebral damage secondary to a diabetic coma and "acute brain syndrome." He also suffered from complex impulse disorder and dementia. Tracy was a patient at Larned State Hospital for approximately 32 years with brief stays at Topeka State Hospital and Osawatomie State Hospital.
At Larned, Tracy was placed in a secured unit for civilly committed mentally ill patients from October 1974 to January 2003, due to his aggressive behavior toward staff and other residents. Tracy was transferred to an adult psychiatric treatment unit until January 2004, when he was discharged from Larned State Hospital and sent to a nursing home in Larned. Tracy's combative behavior eventually led to transfers to medical facilities and a legal commitment proceeding.
In April 2004, the district court issued an order involuntarily committing Tracy to treatment at Larned. He initially was released to Wheatland but then sent back to Larned briefly before returning to Wheatland again on October 14, 2004. Larned's October 2004 discharge form, which was signed by a Wheatland representative, indicated "Tracy's diet is [a] carbohydrate-controlled mechanical dysphagia diet." Regarding the concern for aspiration, the discharge form indicated "[s]uction set up in dining room." And regarding the need to monitor the amount and speed of Tracy's food consumption, the discharge form stated: "Give small cups of liquid at each meal to slow his consumption."
At Wheatland, staff made several notes in Tracy's medical records regarding his food intake, including that Tracy had difficulty swallowing and a habit of regurgitation of snacks and meals; that he was at risk for aspiration; and that he ate his food quickly, filling his mouth before swallowing. Further, the medical records indicated Tracy needed assistance and supervision with eating due to risks. However, a physician's note indicates Tracy was not in distress and could feed himself.
On the evening of November 3, 2004, Tracy managed to grab a half of a cheese sandwich off a snack cart and stuff it in his mouth, causing him to choke. Wheatland's staff unsuccessfully attempted to retrieve the sandwich, but Tracy had aspirated the contents and became unresponsive. Wheatland's staff contacted emergency medical services (EMS) as well as the nursing home's on-call physician, who ordered Tracy's transport to the hospital emergency room.
In the meantime, Wheatland's staff continued unsuccessfully to suction Tracy's airway until the ambulance arrived. When EMS personnel arrived, Tracy was barely breathing and unresponsive. Tracy was pronounced dead at the hospital.
Tracy's brother David, individually and as special administrator of Tracy's estate, filed a wrongful death and survivor action against Wheatland. The petition made several allegations common to both the wrongful death and survivor action, including inter alia, that the nursing home was negligent and breached a duty of care owed to Tracy (1) by failing to properly monitor and supervise Tracy, given his history of difficulty swallowing, regurgitating, and choking; (2) by failing to properly hire, train, and supervise the Wheatland staff; (3) by failing to properly monitor and supervise the food cart; and (4) *1221 by failing to provide sufficient personnel to insure reasonable monitoring and supervision.
Regarding the survivor action, David alleged Wheatland's negligence directly and "proximately caused or contributed to cause" Tracy to suffer "severe pain, mental anguish, and an agonizing death." Regarding his wrongful death action, David alleged Wheatland's negligence directly and "proximately caused or contributed to cause" medical and funeral expenses and caused David to suffer "mental anguish, bereavement, the loss of Tracy's society, companionship, care, and attention." The petition sought damages in the amount of $502,100.07.
After Wheatland learned through discovery that David did not intend to call any expert witnesses regarding the applicable standard of care, Wheatland moved for summary judgment on this basis. David responded that because this was not a medical malpractice case, expert opinion was unnecessary. Further, he suggested that jurors could use their common knowledge to determine whether, given Tracy's disabilities, Wheatland's staff provided routine assistance with Tracy's activities of daily living, including supervision and monitoring around meals and food.
The district court granted summary judgment, finding expert testimony was required regarding whether Wheatland deviated from the standard of care in its initial assessment or acceptance of Tracy as a resident and whether Wheatland's care, treatment, supervision, and monitoring of Tracy was reasonable under the "community standard of care."
David appeals the district court's order granting summary judgment in favor of Wheatland.

Did the District Court Err in Concluding That David's Failure to Name an Expert Witness on the Standard of Care Required Summary Judgment In Favor of Wheatland?
On appeal, David contends the district court erred in concluding he was required to present expert opinion testimony to establish the applicable standard of care.
Our standard of review from an order granting summary judgment is well settled:
"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." Miller v. Westport Ins. Corp., 288 Kan. 27, Syl. ¶ 1, 200 P.3d 419 (2009).
Generally, summary judgment should be granted with caution in negligence actions but may be proper if the only questions presented are questions of law. Smith v. Kansas Gas Service Co., 285 Kan. 33, 39, 169 P.3d 1052 (2007).

A. Classification of claim
David first points out that expert testimony regarding the standard of care has been required in a variety of specialized contexts, including medical malpractice, architectural negligence, and legal malpractice. However, he asserts that because this case involved "activities of daily living," rather than medical malpractice, expert opinion testimony was not required.
We have consistently rejected the notion that classification of a claim as ordinary *1222 negligence rather than medical malpractice determines whether expert testimony is required. See, e.g., Cunningham v. Riverside Health System, Inc., 33 Kan.App.2d 1, 5, 99 P.3d 133 (2004). Instead, expert testimony is necessary only if the matter is outside the common knowledge of the jury. Williamson v. Amrani, 283 Kan. 227, 245, 152 P.3d 60 (2007), superceded by statute on other grounds as stated in Kelly v. VinZant, 287 Kan. 509, 197 P.3d 803 (2008); Singh v. Krueger, 39 Kan.App.2d 637, Syl. ¶ 2, 183 P.3d 1, rev. denied 286 Kan. 1180 (2008).
Thus we reject David's suggestion that expert testimony was unnecessary based on the classification of the case.

B. The "Common Knowledge" Exception
Alternatively, David suggests he was not required to present expert testimony because the facts of this case permit application of the "common knowledge exception." That exception applies when what is alleged to have occurred in the diagnosis, treatment, or care of a patient is so obviously lacking in reasonable care and the results so bad that the lack of reasonable care would be apparent to and within the common knowledge and experience of mankind generally. Webb v. Lungstrum, 223 Kan. 487, 490, 575 P.2d 22 (1978).
David asserts that the facts of this case would permit jury members to rely upon their common knowledge to determine whether Wheatland breached the standard of care in failing to monitor and supervise its employees, resulting in Tracy's death. In support, David cites Juhnke v. Evangelical Lutheran Good Samaritan Society, 6 Kan. App.2d 744, 634 P.2d 1132 (1981), where a panel of this court articulated the legal standard of care for proprietors of Kansas nursing homes. "As a general rule, the proprietors of a nursing home are under a duty to exercise reasonable care to avoid injuries to patients, and the reasonableness of such care is to be assessed in the light of the patient's physical and mental condition." 6 Kan.App.2d 744, Syl. ¶ 2, 634 P.2d 1132.
In Juhnke, a nursing home patient's guardian and conservator brought a personal injury action alleging the nursing home was negligent in failing to exercise ordinary care to protect the patient from assault and injury by a fellow patient. The evidence showed that the fellow patient had suffered from progressive mental deterioration for more than a year, and the nursing home was aware that as her condition deteriorated, she acted belligerently and would wander into the rooms of other patients, pushing, tripping, and injuring others.
The district court sustained the nursing home's motion for a directed verdict at the close of the plaintiff's evidence based on the plaintiff's failure to present expert testimony regarding the nursing home's standard of care and whether there was a deviation from that standard. On appeal, this court reasoned that whether expert testimony is necessary to prove negligence depends on whether, under the facts, "the trier of fact would be able to understand, absent expert testimony, the nature of the standard of care required of defendant and the alleged deviation therefrom." 6 Kan.App.2d at 748, 634 P.2d 1132. The Juhnke court found that expert testimony was not required because the treatment and care of the patient "was so obviously lacking in reasonable care and had such serious consequences that the lack of reasonable care would have been apparent to and within the common knowledge and experience of mankind in general." 6 Kan.App.2d at 748, 634 P.2d 1132.
Likening this case to Juhnke, David argues the nursing home's failure to provide Tracy with adequate care and assistance with daily activities, including monitoring him when he was near food, was so obviously lacking in reasonable care and the results so serious that the lack of reasonable care was apparent to and within the common knowledge of a layperson.
Wheatland points out that the standard of care enunciated in Juhnke was based on the specific facts of that case and that the court emphasized that reasonableness is to be assessed *1223 "in the light of the patient's physical and mental condition." 6 Kan.App.2d at 748, 634 P.2d 1132. Wheatland further suggests that Tracy's physical and mental conditions were complex and unique, necessitating a different result than the result reached in Juhnke.
In support of its argument that expert testimony was required, Wheatland cites Cunningham v. Riverside Health System, Inc., 33 Kan.App.2d 1, 99 P.3d 133 (2004). There, a nursing facility patient alleged that following her knee surgery, she was negligently transferred to her bed by a nursing assistant, causing a fractured femur. The district court granted summary judgment finding the common knowledge exception inapplicable and concluding expert testimony was required to prove the appropriate standard of care and causation.
On appeal, Cunningham argued the nursing assistant fractured Cunningham's femur by pulling and tugging on her leg during the transfer to her bed, and that this action was so obviously lacking in reasonable care that it fell within the common knowledge exception.
The Cunningham panel observed that "`[n]egligence is never presumed and may not be inferred merely from a lack of success or an adverse result from treatment.'" 33 Kan.App.2d at 8, 99 P.3d 133 (quoting Bacon v. Mercy Hosp. of Ft. Scott, 243 Kan. 303, 307, 756 P.2d 416 [1988]). In agreeing with the district court that expert testimony on the standard of care was necessary, the panel pointed to specific facts, including (1) Cunningham's knee replacement surgery was made necessary by her weakened bone condition, of which the staff was aware; (2) Cunningham was in a skilled nursing unit for post-surgery care; and (3) the staff had been provided with a physician's recommendations regarding positioning and movement of Cunningham's leg. 33 Kan.App.2d at 8, 99 P.3d 133; see also SunBridge Healthcare Corp. v. Penny, 160 S.W.3d 230, 246-47 (Tex.App. 2005) (expert testimony was required to aid jury in determining whether nursing home operator was negligent in failing to provide adequate staffing); Perdieu v. Blackstone Family Practice Center, 264 Va. 408, 422, 568 S.E.2d 703 (2002) (jury lacked common knowledge of the appropriate standard of care required by a nursing home to prevent falls by residents).
Wheatland argues the facts of this case are analogous to those in Cunningham because laypersons generally lack knowledge of the standard of care required for someone with Tracy's known preexisting conditions, which included severe cerebral damage secondary to a diabetic coma, "acute brain syndrome," complex impulse disorder, and dementia.
David suggests that "there is nothing complex about this case" and that laypersons can use their common knowledge, including their "experience with infants, small children and frail elderly relatives, friends or acquaintances who need assistance with basic activities of daily living...."
David's argument is flawed in several respects. First, it erroneously assumes that all laypersons have "life experience" as care givers, i.e., with providing assistance to others with their daily activities. Further, it wrongly assumes that if a layperson has care giving experience, that experience necessarily equates to a general understanding of the level of care required of a nursing home staff when providing patients with assistance in daily living activities. Finally, David's argument does not recognize that a layperson's life experience would not necessarily provide an understanding of the standard of care required for a patient with Tracy's particular symptoms and conditions.
Perhaps recognizing these flaws, David suggests that in lieu of expert testimony, the jury could be instructed as to the applicable standard of care under the Adult Care Home Licensure Act, K.S.A.2008 Supp. 39-923 et seq., and the rules and regulations promulgated thereunder, K.A.R. XX-XX-XXX et seq. He notes that the purpose of the Act is the "development, establishment, and enforcement of standards ... for the care, treatment, health, safety, welfare and comfort *1224 of individuals" in licensed adult care homes. K.S.A.2008 Supp. 39-924. Additionally, he points out that K.S.A.2008 Supp. 39-1401(g) defines "neglect" as the "failure or omission by one's self, caretaker or another person with a duty to provide goods or services which are reasonably necessary to ensure safety and well-being and to avoid physical or mental harm or illness."
As an example of a more specific standard of care, David refers us to K.A.R. XX-XX-XXX. That regulation addresses the admission, transfer, and discharge rights of residents and provides that the "adult care home shall admit only those persons whose physical, mental and psychosocial needs can be met within the accommodations and services available" in the facility. K.A.R. XX-XX-XXX(i)(1). Further, David points out that K.A.R. XX-XX-XXX requires a comprehensive assessment of a resident's needs upon admission.
But the statutory and regulatory provisions cited by David are not self-evident in terms of their application to the specific facts of this case. For instance, the statutes and regulations do not define the "goods or services" that were "reasonably necessary to ensure [Tracy's] safety and well-being and to avoid physical or mental harm or illness" in light of Tracy's extensive and complex medical condition. Similarly, the regulations do not define "reasonable care" with respect to evaluating Tracy's physical, mental, and psychosocial needs and whether Wheatland was able to meet these needs based on the "accommodations and services available" at Wheatland.
Finally, as Wheatland aptly points out, to the extent David attempts to advance a private cause of action based on alleged violations of the Adult Care Home Licensure Act and applicable regulations, his attempt must fail. To bring a private cause of action for the violation of a statute or a regulation, the plaintiff must establish that the statute or regulation was designed to protect a specific group of people rather than the public at large, and that the legislature or regulatory agency intended to provide enforcement of the statute or regulation through private causes of action. Nichols v. Kansas Political Action Committee, 270 Kan. 37, 48, 11 P.3d 1134 (2000). David makes no such assertions here.
In conclusion, we agree with Wheatland that under the facts and circumstances of this case, David was required to identify an expert to testify regarding the applicable standard of care required of the nursing home in light of Tracy's particular conditions and symptoms. The district court did not err in granting Wheatland summary judgment based on David's failure to do so.
Affirmed.